YELVERTON, Judge.
Plaintiff sued for collection of two promissory notes against the deceased-debtor’s estate. The administratrix-defendant refused to pay. She alleged that the plaintiff loaned the deceased money for an illegal gaming operation involving two video poker machines. (This action predates Act 1062 of the 1991 Legislature which effectively legalized draw poker devices.) The defendant alleged that the notes were unenforceable for unlawful cause. The trial court held that the notes were valid and ruled in favor of the plaintiff. We reverse and dismiss.
FACTS
Eddie Domingue, d/b/a Domingue Amusement, is the plaintiff in this action. He runs Domingue Amusement which is a family partnership that is in the business of providing bars, lounges and other businesses with various types of coin-operated pinball machines and video games.
Warded Dickinson,' before his death, owned and operated the Cajun Roundup Lounge, also known as “Daddy’s Money,” in Acadia Parish. Dickinson and Do-mingue had an agreement whereby Dickinson allowed Domingue to put two video poker machines in the Cajun Roundup. In exchange Domingue would allow Dickinson to keep a certain percentage of the machines’ weekly proceeds.
Lela Ann Daigle Dickinson is Wardell’s surviving wife. She is administratrix of his estate. Domingue is suing Lela, in her capacity as administratrix, for the collection of two promissory notes, made payable to Domingue Amusement. Domingue claims that Warded authorized and signed both alleged notes.
The first of these notes is dated January 8, 1988. It is made payable to the order of Domingue Amusement, at “each regular weekly checking”, for the principal amount of $1,500 at an interest rate of 10% per annum. Domingue explained that a “checking” was a standard practice wherein an employee of Domingue Amusement would come by the Cajun Roundup on a weekly basis, check the machines, and remove the proceeds from the machines. Do-mingue Amusement would then pay Dickinson a portion of these proceeds. In return, the Cajun Roundup would continue to allow Domingue to keep the machines in the bar.
Since the terms of the note required payment at “each weekly checking,” Do-mingue Amusement would simply keep some or ad of Dickinson’s share of each week’s proceeds as a loan payment. Thus, the terms of the note specifically required payment from the proceeds of the video poker machines.
Domingue explained further that in the event of the Cajun Roundup’s sale or closure, the note would be due on demand.
Domingue claims that the purpose of the loan was start-up money. More specifically, he testified that he made this loan to Dickinson because Domingue Amusement was going to put machines in Dickinson’s place and because he wanted to help Dickinson “start a business.”
Lela claims that the machines were used for an illegal gambling operation. She alleges that Domingue Amusement constantly kept $200 in a metal lock box behind the bar in the Cajun Roundup. Two of the Cajun Roundup employees testified that this money was used to pay those patrons who won on the video poker machines. Therefore, Lela argues that the machine’s weekly proceeds represented winnings from gambling. Accordingly, she contends that since her late husband’s debts were to be repaid from illegal gambling proceeds, the debts are null for want of legal cause.
Domingue denied knowledge of any involvement with illegal gambling payoffs in the Cajun Roundup.
The trial court found that enough money was removed from the machines so that $880 remained in the balance on the first note. As far as the first note is concerned, both sides agree that Dickinson and Do-mingue entered into the agreement as evidenced by the terms of the note.
The second note on which Domingue sues is dated February 29,1988. Its principal is for $2,000. Except for the principal, its terms and conditions are virtually the *798 same as the first note. Lela alleges the second note is also unenforceable for illegal cause.
Domingue claims that the second note represents a personal loan to Wardell. He testified that this loan was made purely out of friendship and that it had nothing to do with the poker machines. Domingue alleges that the second note was secured by Lela’s title to a GMC vehicle and that War-dell was to repay him the $2,000 in two weeks from the date that the loan was made. As evidence of his claims, Do-mingue produced the GMC title at trial.
Directly opposing Domingue’s story about the second promissory note is the fact that this note, like the first one, expressly states that payment is to be taken “from each weekly checking.” The contradiction between Domingue’s assertion of a two week collection period and the note’s express collection period of “each weekly checking” was explained by Domingue as a mistake in draftsmanship.
Besides her primary defense of illegal cause, Lela claims that the signature on the second note is not that of her husband and asserts the affirmative defense of forgery. Lela also raises several technical deficiencies regarding the form of both notes as affirmative defenses against Domingue’s claims.
The trial court accepted the signatures on both notes as that of the deceased. The court also found that the cause was not illegal. Accordingly, it awarded Domingue $880 on the first note plus interest and attorney's fees. It awarded a judgment to Domingue on the second note for $2,000 plus interest and fees.
OPINION
We resolve this case on the issue of illegal cause. In its reasons for ruling, the trial court assessed Domingue’s credibility as follows:
The Court does not accept the testimony of Mr. Domingue that he was unaware or uninformed that these machines paid off. His testimony in many instances was less than credible; ...
However, in addressing the issue of illegal cause, the court held:
The Court will also make a finding that the defendant did not prove that the cause of the loan itself was illegal. Even if the funds which were used to partially repay the loan were obtained from the amusement games, this does not, in and of itself, constitute illegal gambling.
The trial court explained this conclusion with the following reasoning:
The profits on each machine were used to pay the loan. Any ‘illegal pay-off’ which might have occurred involved some third party who played the games, not the plaintiff himself.
In sum, the trial court found that if any illegal gambling was going on, it occurred between the Cajun Roundup and its patrons. It ruled that Domingue’s knowledge of illegal payoffs did not make him a member of the gambling venture. Therefore, it found that Domingue’s being paid from the poker machine proceeds did not support the affirmative defense of illegal cause.
We disagree. Cause is the reason why a party obligates himself. La.C.C. art. 1967. An obligation cannot exist without lawful cause. La.C.C. art. 1966. La.C.C. art. 1968 defines unlawful cause as follows:
The cause of an obligation is unlawful when the enforcement of the obligation would produce a result prohibited by law or against public policy.
We find that Domingue loaned money to Wardell not only for the 10% per annum interest but also in exchange for the right to put machines in the Cajun Roundup. We base this finding on the fact that Domingue, while testifying, explained that he made the $1500 loan “because we (Domingue and another ‘operator’) were both going to put equipment in the place.” Thus, we find that Domingue sought to profit from the $1500 promissory note not only by the interest, but also by the profit that the machines would make by virtue of their being located in the Cajun Roundup. In other words, the cause of Domingue’s *799 obligation was profit from the poker machines.
Having ascertained the cause of the obligation, we must now determine its legality. The trial court found that the profits from the machines were used to pay the loans. It further held that any illegal payoffs which may have occurred did not involve the plaintiff. Therefore, it held that the cause was valid.
The trial court’s reasoning is incorrect. In its reasons the trial court found that Domingue’s testimony was not credible. It did not accept Domingue’s assertions of his lack of knowledge about illegal payoffs. The essence, then, of the trial court’s factual findings is that the machines were used for gambling and that Domingue was well aware of this fact. Furthermore, it found that “[t]he profits on each machine were used to pay the loan.”
When this case happened, gambling was prohibited by LSA-R.S. 14:90 A(l)(a). The statute defined gambling as follows:
A. (l)(a) Gambling is the intentional conducting, or directly assisting in the conducting, as a business, of any game, contest, lottery, or contrivance whereby a person risks the loss of anything of value in order to realize a profit.
If the Cajun Roundup regularly paid off winners, as the record indicates, then those patrons who played the machines were gambling. This means that the machines’ profits consisted of money that once belonged to those patrons who gambled and lost. In other words, the machines’ profits represented the house’s winnings.
The trial court found that both notes were self-proving. The collection clauses of both notes state that the debt is to be paid out of “each weekly checking.” Since each weekly checking consists of house winnings, it is our finding that Domingue’s debt was to be paid knowingly from illegal gambling winnings.
The Fourth Circuit was faced with a similar issue in Lillis v. Perez, 144 So.2d 455 (La.App. 4th Cir.1962). In the facts of that case both sides admitted that the lender had exacted a promise of a bonus payable from the profits of an illegal gambling operation. In his efforts to uphold his loan’s validity, the- lender argued that he was merely an innocent bystander who made the loan to the illegal gambling venture out of personal friendship and not for profit.
The court addressed the plaintiff-lender’s argument as follows:
[1] We can find no merit in plaintiff’s contention. Certainly if the plaintiff had been moved to loan this money solely because he expected to receive therefor the repayment of principal plus interest, his argument would be forceful. However, when he exacted the promise of a bonus payable from the profits of the gambling operations, he conditioned the full repayment of the loan to the success of the gambling operations and to that extent he became a participant in the gambling venture. We, therefore, agree with the trial court that one of the prime causes which moved plaintiff to enter into this transaction was the expectation of profits to be derived by him from the gambling operations.

Id.

Adopting the lower court’s ruling, the Fourth Circuit in Perez held the following:
“The Court having found that the note sued upon was given for the promotion of an illegal venture, the Court will not lend itself to the enforcement of said illegal contract and the court will accordingly dismiss plaintiff’s suit.”
In Perez, there was no factual dispute to the lender’s knowledge of the illegal nature of his transaction. In the case before us, such a dispute does exist. However, the trial court expressly found that Do-mingue’s denial of knowing anything about illegal payoffs was unacceptable. Thus, as a matter of fact, the trial court effectively found that Domingue did know of the illegal gambling activities. Domingue made the loans to Wardell for the promotion of illegal gambling.
Accordingly, we find that the cause of both alleged obligations was illegal. Therefore both obligations are void.
*800 Having found that both obligations are void, it is unnecessary to address the remaining assignments of error.
The judgment is reversed. Judgment is rendered dismissing the suit at plaintiff’s cost.
REVERSED AND RENDERED.