# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 23-195


**DEALER SERVICES SOUTH, INC.**

**VERSUS**

**MARTIN AUTOMOTIVE GROUP, INC.**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2018-5417
HONORABLE DAVID ALEXANDER RITCHIE, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**SHANNON J. GREMILLION**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Elizabeth A. Pickett, Shannon J. Gremillion, and Charles G. Fitzgerald, Judges.


**AFFIRMED.**

**Walter M. Sanchez**
**Sanchez Law Firm**
**1200 Ryan Street**
**Lake Charles, LA 70601**
**(337) 433-4405**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Dealer Services South, Inc.**
    **Edward G. Martin, Jr.**

**David L. Marcus**
**Attorney at Law**
**4700 Belleview, Suite 200**
**Kansas City, Missouri 64112**
**(816) 256-4699**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Dealer Services South, Inc.**
    **Edward G. Martin, Jr.**

**Paul L. Veazey, Jr.**
**Stockwell, Sievert, Viccellio, Clemets & Shaddock, LLP**
**127 Broad Street, Fourth Floor**
**P. O. Box 2900**
**Lake Charles, LA 70601**
**(337) 436-9491**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Martin Automotive Group, Inc.**

**GREMILLION, Judge.**

Plaintiff/Appellant, Dealer Services South, Inc. appeals the trial court's judgment dismissing its breach of contract claim against Martin Automotive Group, Inc. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Martin Automotive Group (MAG) sold packages for a variety of services to its car-buying customers brokered by Dealer Services South, Inc. (DSSI), whose chairman and CEO is Mark Mader. Mader received a commission from the insurance companies underwriting the services on each contract MAG sold. DSSI had provided these services to the dealership since 2010. However, in 2014, DSSI had its attorney, who was also DSSI's counsel at the trial, create the "Dealer Agreement," which provided that if MAG failed to meet certain quotas relating to the provision and sales of lifetime powertrain warranties, extended service warranties, etch theft deterrent systems, and GAP contracts, MAG would have to make up the difference in commissions. MAG failed to meet sales quotas set by DSSI, and DSSI asked MAG to make up the difference. MAG refused to pay, and DSSI filed suit on January 14, 2019, for breach of contract, claiming MAG owed it $342,905.00 for breach of the May 2014 Dealer Agreement between Mader and Edward G. Martin Jr. (Chip), the then president of MAG.

In December 2019, DSSI filed a motion for partial summary judgment, urging that the Dealer Agreement was a valid and binding contract. Attached to the motion were affidavits of Mader and Martin attesting that they each signed the Dealer Agreement. MAG opposed the motion and attached the affidavits of six people, including a forensic document examiner, and the depositions of Chip and his sister, Kathryn McNutt. Following a January 2021 hearing, the trial court denied DSSI's motion for partial summary judgment.

On November 15, 2021, MAG filed a motion for leave to file a third-party demand against Chip alleging breach of his fiduciary duty to MAG if the Dealer Agreement was found valid. DSSI opposed the motion. The trial court's December 2021 order granted MAG's motion for leave to file the third-party demand.

Following a three-day trial on February 22-23, 2022 and June 16, 2022, the trial court rendered extensive oral reasons for ruling on August 30, 2022. The trial court signed a written judgment on September 20, 2022. DSSI and MAG timely appealed.

DSSI now appeals and assigns as error:

1. The trial court erred in failing to find that Martin signed the Dealer Agreement on MAG's behalf.

2. The trial court erred in failing to find Martin acted with at least apparent authority in signing the Dealer Agreement on MAG's behalf.

MAG, third-party plaintiff, also appealed and assigns as error:

Had the trial court not properly dismissed DSSI's petition with prejudice, the trial court's dismissal of MAG's third-party demand as moot would have been legal error.

## DISCUSSION

At trial, MAG argued the Dealer Agreement was unenforceable because Chip lacked authority to sign on MAG's behalf or that his signature was a forgery. The trial court found the agreement unenforceable. The following testimony and evidence was introduced at trial.

### Mark Mader

Mader testified that he signed the Dealer Agreement and Chip signed it in his presence. Mader said he and Chip signed the document on Mader's electronic tablet with their fingers. Mader testified regarding the terms of the contract. He said the date of the contract was May 1, 2014. Prior to that time, DSSI had an agreement

with MAG that it would sell various products for it; however, Mader said that a different dealership, Navarre Automotive, was interested in the programs he offered, and Mader proposed to Edward Martin, Sr. and Chip a program where certain minimums had to be met in order for MAG to achieve exclusivity related to the products. Mader said, "I would have made more money off of this one product with Navarre than with all the products I had at Martin. So it was a business decision I was making." Mader said he worked with the company to improve its numbers, which were not meeting the stated goals. He said there never was a true-up because Martin, Sr. was ill and Mader's house flooded in August 2016.

Mader then reviewed an email sent to Terry Taylor, who succeeded Chip in 2018, with his intentions to enforce the contract. On November 5, 2018, Mader sent a demand letter to MAG for approximately $300,000.00 for failing to meet sales quotas on extended warranty contracts, GAP contracts, theft deterrent etch contracts, and lifetime powertrain loyalty certificates. However, Mader said that MAG did not respond to the letter.

On cross-examination, Mader was questioned about the veracity of whether Navarre Automotive wanted to take the program away from MAG and the "exclusivity" of it because Mader had not described any of that in his deposition. He admitted that he sent Taylor the previous agreement that Premier Dealer Services had with MAG since 2010 rather than the 2014 Dealer Agreement in question in the email string. Mader said the signatures to the Dealer Agreement were captured on a Samsung device using Android software in an app that he did not remember the name of. He said when he returned to his office, he printed out the contract and brought a paper copy back to the dealership, giving one to Chip and leaving one on Martin, Sr.'s desk. However, Mader said the tablet was lost in the August 2016 flood in Baton Rouge, and the original could not be produced.

3

*Chip Martin*

Chip testified he was the president and general manager of MAG from about 2000 through 2016-17. He said he regularly signed all kinds of contracts on behalf of the company and appeared in TV, radio, and newspaper advertising. He said MAG's relationship with Mader began in about 2007. Chip said he signed the Dealer Agreement on an electronic device with his finger with the express approval of his father. Chip was shown the previous contract with DSSI to sell similar products which required no minimums, had no termination penalty, and was not for a specific term.

Chip said he signed the contract before there was an "actual board functioning at the Martin Automotive Group." He said that his father knew the quotas were not being met, and that once board meetings commenced in 2016, he did not "formally" inform the board that the numbers were not being met. Chip testified that after he electronically signed the document, he gave the copy Mader brought to him to Kay Miller, the controller. The trial court inquired why he entered into a contract to meet certain numbers that had never been met in the years prior, but Chip said that he expected to meet the goals because of the change of location of the dealership. The new location opened on November 17, 2014.

Chip later admitted that board meetings began in January 2014, before this contract was confected, rather than in 2016 as he testified earlier. He further admitted that the board meeting agenda required him to report any contracts that were signed and by whom.

*Amy Hood*

Amy testified that she worked at MAG since 2005, in various management positions. She stated that she was totally unaware of the Dealer Agreement until sometime in 2018. She said she first learned of it close to the time when the

4

dealership was being sold. Hood said between the 2014-2018 period there was less training by Mader or his employees, but he did visit periodically.

***Daryl Hood***

Daryl worked at MAG since 2010, and in April of 2014, worked in the finance and insurance department that sold the products involved in this case, which were also known as F & I products. Daryl now works at Navarre. Darryl said the first time he ever saw the Dealer Agreement was very close to the sale of MAG to the Navarre Group. Daryl said he was very familiar with Chip's signature because he signed all of his paychecks and all of the F & I contracts for the products that Daryl sold. Daryl testified that he did not believe the signature on the Dealer Agreement was Chip's because it was not "rigid and jagged and sharp" but instead had "circles" and "he didn't do that." Daryl was asked if he had would have known about the existence of the contract that had quota minimums and said, "I don't know whether I would have known about it or not, but I feel like somebody would've told me I needed to sell more of them, you know." He said no one ever told him he needed to sell a certain number of products or that there was any early termination penalty.

Daryl noted, however, that he had never seen Chip sign something on an electronic device and would not know what his electronic signature looked like compared to his regular signature. He said neither Mader nor Chip ever spoke to him about raising the numbers of F & I products sold to meet quota minimums.

***Terry Taylor***

Taylor, who was president and general manager of MAG following Chip's tenure, testified that he first became aware of the Dealer Agreement on October 30, 2018, the day before they were going to close on the dealership on Highway 14. Taylor stated he was very familiar with Chip's signature and that it did not look like his on the Dealer Agreement. He said, "Well, Chip's signature has a tendency to be

5

very tight, very small, and if this is the actual size page of that document, it – his signature just loo[k]s big on here. It looks big and bold compared to what I'm accustomed to seeing." He went on to state that the "M" does not look like his and in the past, "that little tail that's on the – on the end of his name, is usually is much lower and going to the right. And the first of it, I'm not even sure what that is." He concluded, "Well, it just doesn't look anything like what I normally have seen from him. I mean, it's different."

Taylor then discussed the email string in which he asked Mader for a copy of the existing contracts relating to the powertrain warranty because he needed to give them to the Navarre Group. He said, "[Mader] emailed me a copy of the Premier Dealer Services contract and so I made the assumption that was the only contract in existence for that purpose as that time and went on about my work." In preparation for the sale of the dealership, he discussed with Amy what to tell the customers about their existing powertrain warranties. They called Mader to inquire. Taylor testified:

> And we called [Mader] and we posed that very question to him. Well, instead of answering the question, what he said to me was, I have here something that you probably don't have and I'm gonna email it to you. So okay, I was still confused because I didn't know –we still didn't have an answer to our questions and I wasn't quite sure what he was talking about. And then this email came and he definitely says a contract there, but he never mentioned a contract to us on the phone that day, that I recall, so this is the DSSI contract that I guess is in question.

Taylor said Mader informed him there were requirements under the contract, but he "still had no idea what he was talking about." Taylor went on to testify:

> I had asked [Mader] about where did all this come from and how'd it come to be, et cetera and so forth, and he told me, he says, well, this is something Chip and Ed Martin agreed to. And I told him, I said, well, this is a very one-sided contract. I said what's in it for us? And he said, well you get to sell those lifetime powertrain warranties. And I happen to look down at the contract that was laying there on my desk and I said to him I said, Marc, this doesn't even look like Ed – Chip's signature. I said it's much different tha[n] his signature. And he made the comment back to me, he says, well, if you don't believe it's his

6

signature, I'll get all the signature experts in the world to testify that it is his signature. And that's kind of where we left it.

Taylor did note that he only started working at MAG in October 2016, about two years after the Dealer Agreement was allegedly signed.

***Robert Foley***

Foley, a forensic document examiner for over fifty years, was qualified as an expert in forensic document examination. Foley testified in detail about his methodology in comparing signatures. He had thirty-five known samples of Chip's signature to compare against the electronic one. Foley extensively discussed aspects of each letter of Chip's known signatures and characteristics attributable to the letter formations in his signature. Foley concluded regarding the signature on the Dealer Agreement: "[I]t's probable that the person who wrote the comparative signatures of Mr. Ed Martin [Jr.] did not sign the Exhibit 16 [Dealer Agreement]." Foley said initially he was unaware that the signature was electronic. Foley still concluded:

> [I]t's more probable than not that Edward Martin [Chip] signature appearing upon the Exhibit 16 Dealer Agreement, in my opinion, is not genuine, was not signed by the signer of these other exhibits with his signature on them and it's based upon the differences observed in the structure themselves, as well as, the claim of being an electronic signature, which is not consistent with my experience at this point in electronic signatures.

Foley admitted that all of the signatures he compared to the electronic one were not electronic signatures.

***Kay Morris***

Morris testified she was the controller at MAG and had been since 2006. She handles all of the financial statements, expenses, cash flow, accounts receivable, and accounts payable. Morris wrote the checks to the insurance companies when one of the products offered by Mader was purchased. She said she has never made a payment to Mader. Morris said she was very familiar with Chip's signature from

day-to-day operations. He would place a second signature on the checks she wrote and sign various other forms on a daily basis.

Morris said the first time she saw the Dealer Agreement was in December 2018. Prior to that, she stated that she was never aware that a certain number of products had to be sold every month or that if MAG failed to, it would owe a penalty to DSSI. She said she should have been aware if it existed because she would need to keep track of sales on their daily operating control (DOC) spreadsheet for cash flow purposes if they were going to have to pay Mader. She reviewed the DOCs that showed how many of each type of product had been sold. For example, for the year 2013, GAP and credit life insurance was sixty-two for the year, and their quota was 144; service contracts was 133, and their quota was 180; special products was 0, and their quota was 156. Similarly, the sales of these products set for the months of January 2014 through April 2014, were at or below 50 percent of the quota.

Morris said she had seen Chip's signature every day for years and that the signature on the Dealer Agreement was not his. She said that the fact that the signature was on an electronic device did not change her opinion. She said she was never given the Dealer Agreement, and if she had been given it, she would have read over it and questioned it as part of her duties because they never attained the minimum requirements set forth in the agreement. She said she would have then taken it to her supervisor. Thereafter, she would have put it in a folder in their fireproof filing cabinet with all other contracts. She said she "couldn't believe it" and was surprised when she found out about the agreement. Morris said all of the filing cabinets were searched for the Dealer Agreement, but it was never found. She said it was not feasible for MAG to meet the terms of the Dealer Agreement. Further, she testified that MAG never paid Mader directly; he received his commissions from the insurance companies that provided the services.

*Katherine "Kay" Martin McNutt*

Kay, Chip's sister, testified that she became the chief financial officer of MAG beginning sometime in 2009 or 2010. She said they began having monthly board meetings in mid-2011. At this time, the corporate by-laws were admitted into evidence. Kay reviewed minutes taken from Board meetings in January 2014 through May 2014. The minutes have a section reviewing any contracts and by whom it was signed; that information was to be provided by the general manager, Chip. She said a contract of that nature would have been expected to be discussed. She said the Dealer Agreement was never discussed at any board meeting. Kay testified no one told her about the Dealer Agreement, and her father definitely would have. Kay reviewed a portion of the December 30, 2013 MAG 2014 outline/to-do list that stated: "Adhere to policy put into place by COB: all new pay plans, changes in pay plans, new contract commitments, contract renewals, and any other commitments related to spending funds is to be approved and signed by the chairman of the board." At that time, her father was the chairman of the board. Kay, who worked closely with her father, opined that "never in a million years" would her father have agreed to the Dealer Agreement. She did admit that the to-do list never became part of the bylaws.

Kay said she only became aware of the Dealer Agreement after Taylor told her about it on October 30 or 31, 2018. Kay testified that, besides being shocked by the content of it, she immediately knew that Chip had not signed it because Chip's signature was very consistent and she had seen it "hundreds and hundreds of times." She said the electronic signature had no resemblance to Chip's signature and was "totally different." She agreed, though, that Chip had been the president of the company for about 20 years and had signed lots of contracts on behalf of the company. She also agreed that it "doesn't make sense" that Chip signed a bank loan

9

making himself personally contingently liable for over $3,000,000 for the business, then took steps to hurt the business.

### *The Trial Court's Ruling*

The trial court stated that DSSI bore the burden of proving that a valid contract existed: "[DSSI] would have to show there was a signature, a valid signature, and that Chip Martin had the authority to, if it was a valid signature, that he had the authority on behalf of Martin Automotive Group to sign that contract and bind Martin Automotive Group to that contract." The trial court discussed at length that there was no communication regarding this alleged contract over the years; no emails sent warning that the sale teams was failing to meet the quotas; that the electronic signatures were post-dated; that the entire agreement, if it existed, was never discussed and was basically a "secret" that no one knew about before October 2018 (when Mater sent an email to Terry Taylor); that Chip only acknowledged his signature when he had nothing to lose several years after his departure; that the Dealer Agreement was never brought to the board meetings; and that Chip did not have authority under the by-laws to sign the contract even if it was his signature.

The trial court further did not believe that the sophisticated businessman, Mader, who had thousands of contracts with dealerships all over the country, did not know that he had to get proper authority. He found all of the witnesses who testified that they had never seen or heard of this agreement until November or December 2018 credible. The trial court also said that Mader would have cut his losses and gone to the other dealerships after two-plus years of not meeting the goals. But that to go four years and not send an email or do anything is "quite telling" and "the whole thing is odd, very odd, that there's no paper trail for any communication whatsoever with anybody. None. None whatsoever. No board meetings, no emails, nothing with hundreds of thousands of dollars at stake." The trial court noted that

there were no emails between Mader or Chip or anyone at the dealership about this agreement.

The trial court opined that nothing new was being offered in the Dealer Agreement and that is why no one at the dealership thought anything about it when they continued doing business as usual after this proposed contract was allegedly signed.

The trial court found Mater and Martin were not credible. It stated:

> there's no evidence – first of all, they don't have the original agreement to begin with, number one. They haven't proven that it's a valid electronic signature that was put on there on the date that it was purportedly signed. In fact, the evidence is opposite that. The evidence shows that it was put on there and it was produced by – I mean the evidence that was produced by Martin Automotive shows that those signatures were acutally placed on there a couple of months later, after this purported date on this agreement.

The trial court further stated: "They haven't even met their burden. Plaintiff hasn't even met its burden that that was a validly executed agreement, that there's a legitimate signature on that agreement[.]" It also said: "I find that there was no valid agreement, that they have not proven that there was a valid contract, a validly signed contract; that there were very suspicious circumstances and credibility problems throughout this case, and I think the third-party demand becomes moot at that point."

***Valid Contract-Forgery***

A breach of contract claim requires that the plaintiff establish that a contract exists, that the contract obligations were breached, and that it suffered damages as a result. *A Caring Home Care Services, LLC v. de la Houssaye*, 17-31 (La.App. 3 Cir. 7/5/17), 224 So.3d 422, *writ denied*, 17-1328 (La. 11/6/17), 229 So.3d 474. A private act between the parties must be signed by them. La.Civ.Code art. 1837. Electronic signatures have the same legal effect as handwritten ones. La.R.S. 9:2607.

11

Fraud resulting from forgery is an affirmative defense. La.Code Civ.P. art. 1005; *Domingue v. Dickinson*, 611 So.2d 796 (La.App. 3 Cir. 1992). "The determination of whether an issue is an affirmative defense is a question of fact resolved by examining the circumstances of the individual case." *Biglane v. Board of Comm'rs, Fifth Louisiana Levee Distric*t, 18-100, 18-101, p. 5 (La.App. 3 Cir. 9/26/18), 256 So.3d 1052, 1057, *writ denied*, 18-1767 (La. 1/8/19), 260 So.3d 588.

DSSI argues the trial court erred by placing the burden on it to prove Chip's signature was not forged. We disagree. Regardless of how DSSI classifies what the trial court stated, it bore the initial burden of proving a valid contract existed. DSSI did establish a prima facie case that a valid contract existed by having Mader and Chip testify that they signed the agreement and were willing to be bound to its terms. However, MAG asserted the affirmative defense of fraud via a forgery, which, if proven, would defeat the existence of a valid contract. La.Code Civ.P. art. 1005. The trial court implicitly found that MAG met that burden of proving that Chip's signature was forged, and we find no error in its finding.

The many facts the trial court discussed in its oral reasons call into question a legitimate reason for entering into the contract. For example, the facts, or lack thereof, surrounding the signing of the contract, the lack of dissemination of the contract to anyone at the dealership, the lack of any email correspondence whatsoever about the alleged contract, the lack of any mention of it in the board meeting minutes, and the fact that no one at the dealership knew about the contract until late 2018. These facts would establish that, if Chip's signature had not been forged, he may have breached his fiduciary duty to his company. However, we need not even reach that question, as the forgery alone is enough to find that no valid contract existed.

We find that the trial court did not manifestly err in finding that the signature bearing Chip's name was forged, even in spite of Chip's own testimony that he signed the document electronically. While the trial court's reasons focused heavily on all the underlying reasons why this contract was not valid, it inferred that Chip's acknowledgment of the signature was after the fact when he had nothing to lose, stating, "like I said, when you're looking at the legitimacy of the signature, I really do question that at this point." The trial court later stated, "I question whether this was actually ever even signed." The trial court went on to state that, even if it was, Chip did not have authority to sign it under MAG's bylaws. The trial court addressed DSSI's argument that the only issue is "identity and representation and a person's willingness to be bound":

> Well, I think that I've kind of addressed that for a while now, you know. I mean I think that you have to look at his motive and the context, Chip Martin's willingness to be bound knowing it's not going to affect him, knowing that it's going to hurt his company way after the fact, years later, when there was no evidence of this contract until years after it was purportedly signed and there was no action taken on this contract for years after it was purportedly signed. It wasn't brought to life until years later. I don't think that part is even – I mean I think his ulterior motive outweighs that if he actually did it.

The trial court subsequently noted, "if he did sign it [] he didn't have the authority to do it." The trial court questioned whether the signature itself was valid for a number of reasons, including whether it actually was electronically signed by anyone or whether the signature was placed on the document with a picture at a later date, though admittedly, the trial court spent a lot of time discussing the questionable circumstances giving rise to this alleged contract. The trial court did state that, "Plaintiff hasn't even met its burden that that was a validly executed agreement, that there's a legitimate signature on that agreement by a representative of Martin Automotive Group." We find the trial court's language does not impermissibly shift the burden to plaintiff to prove the document was not forged. The trial court

13

implicitly found that MAG proved it was forged, and it did not manifestly err as the evidence was overwhelming that the signature on the Dealer Agreement was not Chip's.

DSSI cites *Reno v. Travelers Home and Marine Ins. Co.*, 02-2637 (La.App. 1 Cir. 11/7/03), 867 So.2d 751, for the proposition that Chip's testimony that he signed the contract and intended to be bound by it is all that is required. In *Reno*, the court stated:

> The Renos do not allege fraud or that the Form was signed in error, nor do they disavow the authenticity of their names as they appear on the Form. The Renos merely contend that their printed names are inadequate to bind them on the Form. We find no merit to the Renos' position. The Renos clearly and positively admitted their intention to waive UM coverage in order to save money, and they acknowledged that Mrs. Reno handwrote the printed names on the Form. A signature consists of *both* the act of writing one's name and of the intention of authenticating the instrument. *Action Finance Corp. v. Nichols,* 180 So.2d 81, 83 (La.App. 2 Cir.1965). The fact that a signature is printed by hand rather than written in cursive does not indicate a lack of genuineness. *Boykin v. DeSoto Parish Police Jury,* 359 So.2d 239, 241 (La.App. 2 Cir.), *writ denied,* 360 So.2d 199 (La.1978). It makes no difference whether a signature is printed by hand or handwritten in script or cursive. *It is merely a question of identity and a representation of a person's willingness to be bound. See Williamson v. Guice,* 613 So.2d 797, 799 (La.App. 4 Cir.), *writ denied,* 617 So.2d 937 (La.1993). *See also Smith v. Travelers Ins. Co.,* 560 So.2d 472, 474 (La.App. 1 Cir.), *writ denied,* 564 So.2d 325 (La.1990).

*Id*. at 754 (emphasis added).

In brief, DSSI argues that once Chip acknowledged that he signed the Dealer Agreement, its burden was met to show that the parties executed the document. It states:

> At that point, the burden should have been shifted to MAG to prove Martin's signature had been forged. But it's clear from the trial court's ruling that it did not shift the burden to MAG to prove anything. Nowhere in the trial court's ruling is a finding that Martin's signature was in fact forged. Instead the trial court's exclusive focus was DSSI's purported lack of proof. The trial court downplayed and disregarded the effect of an acknowledged signature on a private agreement."

We disagree. The Renos' identity as the parties who printed, rather than cursively signed, their names on the UM contract was never called into question. In this case, a significant portion of the three-day trial centered on the source of the signature on the Dealer Agreement. Besides the obvious discrepancy on the face of the Dealer Agreement, MAG also presented evidence as to why Chip would profess willingness, that the trial court deemed "ulterior motives," to be bound to a contract that had no benefit for the company on whose behalf he allegedly signed it. While Chip professed his willingness to be bound by the contract at the trial, the signature on the document did not confirm his identity. These facts are unusual in that the party to the contract is not disavowing their own alleged signature, as in *Reno*; however, we find no error in the trial court's finding that MAG met the burden of proving Chip's signature was forged. The electronic signature bore no resemblance whatsoever to Chip's normal signature, as noted by the expert and every single witness, many of whom had no stake whatsoever in the litigation. It is obvious from a quick glance of the thirty-five admitted signatures that the signature on the Dealer Agreement was not Chip's because of very distinguishing characteristics of the signature such as a loopy "M" and otherwise rigid structure of Chip's actual signature which numerous people testified they had seen hundreds of times. **The testimony was overwhelmingly clear that the signature bore no resemblance to Chip's signature.** The trial court clearly found that testimony credible, and we cannot say it erred.

DSSI's last argument that MAG failed to meet its burden of proving a forgery asserts that a forgery does not exist under La.R.S. 14:72 which defines "forge" in part as, "To alter, make, complete, execute, or authenticate any writing so that it purports: to be the act of another who did not authorize the act[.]" DSSI argues that (emphasis added):

MAG could not prove Martin's signature was a forgery merely by presenting proof Martin did not physically sign the document. MAG also was required to show the signature that appears on the Dealer Agreement *was placed there without his authorization*. There is absolutely no evidence in the record to show the signature was unauthorized. Martin was steadfast in his assertion *that he signed* the Dealer Agreement on MAG's behalf.

Without addressing whether the definition of forgery in a criminal statute applies in this civil context, the only party who could prove that he authorized someone else to sign on his behalf was Chip. As noted above, Chip steadfastly claimed that he signed the document, not that he authorized someone else to sign it for him. While we do think this is a difficult burden to overcome when a party acknowledges a signature and willingness to be bound, it can be accomplished, as was done here. Accordingly, this assignment of error is without merit.

Based on our above findings, assignment of error two and MAG's third-party demand are rendered moot.

## CONCLUSION

The judgment of the trial court finding no valid contract existed due to forgery is affirmed. All costs of this appeal are assessed against Dealer Services South, Inc.

**AFFIRMED**.

16